UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE:<br><br>DIPPIN' DOTS, INC.<br><br>       Debtor | BANKRUPTCY NO. 11-51077<br><br>CHAPTER 11 |

**INTERIM AGREED ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 363 AND 364; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO LENDER PURSUANT TO 11 U.S.C. § 364; (III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (IV) PROVIDING ADEQUATE PROTECTION TO LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (V) SCHEDULING A FINAL HEARING**

Dippin' Dots, Inc. ("Debtor") as Debtor and Debtor-in-Possession, having moved (the "Motion") the Court to obtain the relief set forth herein; and Regions Bank ("Lender") having agreed to the terms hereof; the Court having considered the requested relief and being fully advised in the premises; upon the record made at the Interim Hearing on _____, 2011

A.  On November 3, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is operating its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

B.  Lender is the Debtor's senior secured pre-petition lender pursuant to the terms of the loans documents listed on <u>Exhibit 1</u> hereto (the "Loan Documents"). The outstanding indebtedness owing from the Debtor to the Lender as of the Petition Date is $10,870,674.34, excluding attorneys' fees (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness is not subject to defense, counterclaim or offset of any kind.

1

C.     Pursuant to the Loan Documents, the Pre-Petition Indebtedness is secured by blanket liens and mortgages (the "Pre-Petition Liens") in favor of Lender on all of the Debtor's assets, including (i) the real property located at and commonly known as 5101 Charter Oak Drive, Paducah, KY 42001 (the "Real Estate"); and (ii) all of the Debtor's right, title interest in and to all of its personal property, including, without limitation, all cash, the Debtor's inventory, equipment, instruments, documents, accounts, chattel paper, deposit accounts, securities, contract rights, insurance claims, contracts, software, and all general intangibles, including trademarks and other intellectual property (the "Personalty"); and (iii) any proceeds, regardless of form, of the Real Estate or the Personalty (collectively, the "Collateral").

D.     All of the Debtor's cash and proceeds, wherever located, whether as original collateral or cash proceeds of the Collateral, are encumbered by the Pre-Petition Liens and therefore constitute "cash collateral" of the Lender as defined in Section 363(a) of the Bankruptcy Code ("Cash Collateral").

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1.     **Jurisdiction.**  This Court has jurisdiction over the above-captioned bankruptcy case, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     **Notice.**  Notice of the Motion, the relief requested herein, and the Interim Hearing was served by the Debtors on (i) the Office of the United States Trustee for the Western District of Kentucky; (ii) counsel to the Lender; (iii) the 20 largest creditors of the Debtors holding unsecured claims; (iv) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice before the date hereof.  Under the

circumstances, such notice constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b) and (c).

3. **Objections.** All pending objections to the entry of this Order, if any, are resolved hereby or, to the extent not resolved, are overruled.

4. **Validity, Unavoidability and Priority of Liens.** The Debtor acknowledges the validity, unavoidability, and first priority of the Pre-Petition Liens in the Collateral (excluding any properly perfected purchase money security interests of other lenders in the Lender's Collateral). Debtor, and any successor-in-interest, waive and release any claims or causes of action against the Lender relating to the Loan Documents. The acknowledgements and releases in this paragraph shall be binding upon any Chapter 7 Trustee, Chapter 11 Trustee or Creditors' Committee, if any, only upon the earlier of March 6, 2012 or 30 days following the appointment of any Trustee or Committee ("the Investigation Period") unless an action is brought against the lender within the Investigation Period.

5. **Debtor-in-Possession Financing.** The Debtor is hereby authorized to borrow up to an aggregate principal amount of $201,842.34 from Lender the ("DIP Facility") in accordance with the terms of this Order, which shall be used solely for the purposes permitted hereby and in accordance with the Budget attached hereto as Exhibit 2. Unless otherwise extended by written agreement of Lender, the DIP Facility matures and is due in full upon the earlier of (i) closing of the Sale Process (as defined below); (ii) the Termination Date (as defined below). Unless expressly contradicted hereby, the other terms of the DIP Facility shall be as provided in the Loan Documents relating to Note 2 (as described on Exhibit 1 hereto), which are incorporated by reference herein. The DIP Facility shall be secured by Lender's lien on the Collateral, as well as by the additional security set forth below and the other provisions and terms of this Order. The

3

claims and liens in favor of the Lender relating to the DIP Facility shall be deemed effective and perfected as of the date of this Order, without the necessity of additional mortgages, security agreements, financing statements, or other agreements. The Lender is under no obligation to make any additional advances or loans in addition to the DIP Facility. To the extent provided herein, the Lender shall fund the DIP Facility within 24 hours of the entry of this Order, and advances funded under the DIP Facility shall bear interest at the rate of 11.5% *per annum*, and the Debtor shall make monthly interest payments thereon commencing on December 1, 2011.

      5.1    Pursuant to 11 U.S.C. § 364(c)(1), the DIP Facility and any obligation thereunder shall constitute an allowed administrative expense against the Debtor (a "Superpriority Claim") with priority, subject only to the payment of a Carve-Out to the extent specifically provided herein, over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expense claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

      5.2    Pursuant to 11 U.S.C. § 364(c)(2), the DIP Facility and any obligation thereunder shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre-and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively "Unencumbered Property").

      5.3    Pursuant to 11 U.S.C. § 364(c)(3), the DIP Facility and any obligation thereunder shall be secured by a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtor (other than the property

described in Section 2.2 hereof), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date.

6. **Use of Cash Collateral and DIP Facility.**  Debtors are hereby authorized to use all Cash Collateral and the DIP Facility Proceeds on the terms and conditions of this Order and the Budget, including the adequate protection provisions described herein.  The Debtor's right to use Cash Collateral, and the Lender's consent to the use of Cash Collateral, shall terminate immediately upon the earlier of (i) closing of the Sale Process (as defined below); (ii) the Termination Date (as defined below).

7. **The Budget.**

7.1    The amount of Cash Collateral or DIP Facility proceeds to be used hereby shall not exceed the amounts reflected in the initial budget prepared by the Debtor, in a form and substance satisfactory to the Lender and attached hereto as Exhibit 2 (as amended, supplement, extended or otherwise modified from time to time, the "Budget") for the time period set forth therein, but in no event beyond the Termination Date.

7.2    The Debtor represents that (i) the Budget is achievable and will allow the Debtor to operate herein without the accrual of unpaid administrative expenses; and (ii) the budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtor's business for the period set forth in the Budget.

7.3    The Budget shall be amended, supplemented, extended or otherwise modified from time to time in form and substance as to which the Debtors and the Lender mutually agree.

7.4     Within five (5) days after the end of each two week period, the Debtor shall deliver to the Lender (i) an updated Budget, and (ii) a Budget variance report, each in form and substance reasonably satisfactory to the Lender.

7.5     The Debtors shall comply with the Budget.  Compliance with the Budget shall be measured bi-weekly and defined as the maintenance of compliance with both (a) the overall amount of the Budget within a ten (10%) deviation from such Budget, and (ii) certain items on a line-by-line basis in the percentages indicated in the Budget.

7.6     Notwithstanding any other provision herein or in the Budget, Regions consents to the Debtor paying its principal shareholder and CEO, Curt Jones, a gross monthly salary of no greater than $15,000.00 per month.

8.     **Adequate Protection.**

8.1     Interest shall continue to accrue on the Pre-Petition Indebtedness at the default rate specified in the applicable Loan Documents.  Debtor shall not be required to make periodic payments on account of the Pre-Petition Indebtedness while this Order is in effect, except to the extent that the Net Cash position (as described in the Budget) exceeds the $400,000.00 (the "Excess Cash Floor").  To the extent the Debtor's Net Cash position at any point during the term of this Order exceeds the Excess Cash Floor, the Debtor shall remit to the Lender the difference between its Net Cash position and the Excess Cash Floor.  The Excess Cash Floor shall be increased by any advances under the DIP Facility pursuant to this order or otherwise.  For example, upon funding of the DIP Facility pursuant to Paragraph 5 hereof, the Excess Cash Floor would increase by $201,842.34 to $601,842.34.  Notwithstanding the stay imposed by Section 362(a) of the Bankruptcy Code, the Lender is authorized to retain and apply any payments made pursuant to this paragraph.

8.2     The Lender is granted a replacement security interest in and lien upon all of the Debtor's assets, subject and subordinate only to (i) the DIP Facility; (ii) the Carve-Out. Lender and Debtor are not required to execute and/or record any mortgages, security agreements, pledge agreements, financing statements or other documents to effectuate the replacement lien, which is effective pursuant to the terms of this Order.

8.3     The Lender is granted, subject to the payment of the Carve-Out, an allowed superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Lender in relation to the DIP Facility.

9.     **Carve-Out.**  Notwithstanding anything to the contrary contained in this Order, upon the occurrence of the Termination Date (as defined below), the liens and claims granted to the Lender in this Order or the Loan Documents shall be subject to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):

9.1     The claims of retained professionals of (i) the Debtor for unpaid fees and expenses incurred at any time on and after the Petition Date and prior to the Termination Date; and (ii) any other estate (or committee, if any) professionals.  Provided that, in the case of all retained professionals, such fees shall only be included in this Carve-Out to the extent such fees are ultimately allowed on a final basis by the Court under sections 330 or 331 of the Bankruptcy Code, and are not excluded under paragraph 11 of this Order.  This Carve-Out shall not exceed $75,000.00 in the aggregate for retained professionals of the Debtor and shall not exceed $25,000.00 in the aggregate for other retained professionals, if any.

        9.2      The unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of title 28 and Section 3717 of title 31 of the United States Code.

        10.      **Sale Process.**  As additional adequate protection in exchange for the Lender's provision of the DIP Facility and consent to the use of Cash Collateral herein, the Debtor irrevocably agrees that, unless the Debtor and Regions shall have agreed in writing to the terms of a consensual plan of reorganization, it shall seek to sell substantially all of its assets pursuant to section 363 of the Bankruptcy Code (the "Sale Process") and further agrees to the following milestones, as a condition to its continued use of Cash Collateral and the DIP Facility:

        10.1    *Retention of Broker:  January 6, 2012*.  On or before January 6, 2012, the Debtor shall obtain from the Court an order authorizing the retention of a broker (the "Broker") for the purpose of coordinating and assisting with the Sale Process.  The identity, qualifications and engagement terms of the Broker, including any order authorizing the Broker's retention, shall be in form and substance satisfactory to Lender in its sole discretion.

        10.2    *Bid Procedures Motion:  March 6, 2012*.  Debtor shall file a sale and bid procedures motion, including therewith a list of assets to be sold, in form and substance satisfactory to Lender in its sole discretion, on or before March 6, 2012.

        10.3    *Bid Procedures Order:  March 20, 2012*.  Debtor shall obtain entry from the Bankruptcy Court of an order (the "Bid Procedures Order") on or before March 20, 2012 approving bid procedures (and attaching the list of assets to be sold) in form and substance satisfactory to Lender in its sole discretion, which order shall authorize (1) credit bids by the Lender on account of both the Pre-Petition Indebtedness and the DIP Facility; (2) deem the Lender a "Qualified Bidder" (as to be defined in the Bid Procedures Order); and (3) the solicitation of bids for the sale of the Debtor's assets and which shall set a deadline (the "Bid Deadline") to receive bids related to such sale of no later than April 30, 2012.

        10.4    *Auction Date:  May 10*, 2012.  Debtor shall conduct any auction (if required) on or before May 10, 2012.

        10.5    *Sale Order*:  *May 30, 2012*.  Debtor shall obtain entry of an order of the Bankruptcy Court approving the sale and proposed Asset Purchase Agreement, both of which shall be in form and substance satisfactory to the Lender in its sole discretion (the "Sale Order") no later than May 30, 2012.

    10.6 *Closing: June 1, 2012*.  Debtor shall close the sale authorized by the Sale Order no later than June 1, 2012.

  The foregoing milestones (the "Sales Milestones") may only be extended with the written consent of the Lender.

    11. **Limitations on Use of Cash Collateral or DIP Facility Proceeds.**  Notwithstanding anything herein to the contrary, no Cash Collateral or DIP Facility proceeds may be used to (i) object, contest or raise any defense to, the validity, authorization, perfection, priority, extent, or enforceability of the Pre-Petition Indebtedness, the liens securing the Pre-Petition Indebtedness, the liens granted to the Lender pursuant to this Order, or the adequate protection provided by this Order to the Lender; (ii) assert any claims or causes of action against the Lender; (iii) prevent, hinder or otherwise delay the Lender's assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the Loan Documents or this Order.

    12. **Termination.**  The use of Cash Collateral authorized herein shall terminate (the effective date of such termination, the "Termination Date") effective on the earlier to occur of (a) receipt by the Debtor of written notice from the Lender of the occurrence and continuance of an Event of Default (as defined herein); and (b) 11:59 p.m. (prevailing Eastern time) on June 2, 2012 (or such longer period of time as may be consented to by the Lender in writing).  Upon the Termination Date, Regions may move for the expedited appointment of a Chapter 11 Trustee, which shall be heard (if practicable, according to the Court's availability) on 48 hours notice.  Regions and the Debtor agree that, if the Court determines that the Debtor has failed to comply with any of the Sales Milestones, such failure will constitute "cause" under Section 1104(a)(1) of the Bankruptcy Code.  The Debtor may oppose any motion to appoint a trustee, but if such

motion is filed by Regions after the Termination Date, the Debtor (by agreement) will bear the burden to demonstrate why a Trustee should not be appointed.

13. **Events of Default.**  Each of the following shall constitute an "Event of Default" hereunder:  (i) the use of Cash Collateral or DIP Facility proceeds other than as set forth herein; (ii) the Debtor or any other party applies to the court for an order, other than this Order (or a final version of this Order) authorizing the use of the Cash Collateral or that seeks approval of a priming, senior, or pari passu security interest in or lien upon the Cash Collateral or the Collateral; (iii) the filing by the Debtor of any pleading seeking to challenge the Lender's lien upon the Cash Collateral or the Collateral or otherwise asserting rights, claims or causes of action against the Lender with respect to the Pre-Petition Indebtedness or the DIP Facility; (iv) the breach by the Debtor of its obligations under this Order, including but not limited to compliance with the Budget; (v) any stay, reversal, vacatur or rescission of this Order; (vi) the dismissal of, conversion of, or appointment of an examiner with expanded powers in this case; (vii) the failure to meet any obligations of the Debtor related to the Sale Process, including the Sales Milestones; (viii) the failure to obtain entry of a final order approving the use of Cash Collateral and DIP Facility in form and substance satisfactory to the Lender in its sole discretion on or before the date that is thirty (30) days from the Petition Date; and (ix) the filing by the Debtor of any plan of reorganization, prior to the closing of the Sale Process, which plan does not propose to sell substantially all of Debtor's assets <u>and</u> provide for Lender's unrestricted ability to credit bid the Pre-Petition Indebtedness and the DIP Facility debt at any such sale.

14. **Preservation of Rights.**  No modifications or extensions of this Order shall be effective against the Lender except as the Lender agrees in writing.  If an order dismissing or converting this case is at any time entered, such order shall provide that the rights, security

interests and replacement security interests granted to Lender pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all of the Pre-Petition Indebtedness and DIP Facility indebtedness has been paid in full.

15. **Binding Effect; Successors and Assigns.**  The provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in this case, including, without limitation, the Lender, any Creditors' Committee, the Debtor and their successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed by or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of any of the Debtor's estate) and shall inure to the benefit of the Lender and the Debtor and each of their respective successors and assigns.

16. **Limitation of Liability.**  In determining to exercise any rights or remedies as and when permitted under this Order, the Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation and management of the Debtor.  Furthermore, nothing in this Order shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability from any claims arising from the prepetition or postpetition activities of the Debtor or its affiliates in the operation of its business, or in connection with its restructuring efforts.

17. **Matters Relating to BB&T Accounts.**  From the Petition Date until Termination, the Debtor's accounts at Branch Banking & Trust Company ("BB&T") that were frozen pursuant to that Notice of Exclusive Control issued by Regions on November 2, 2011 shall remain unfrozen to permit the Debtor to comply with the terms of this Order.  Regions agrees, and the Court orders, that BB&T shall take direction from the Debtor regarding its

BB&T accounts as if no Notice of Exclusive Control were issued. However, neither this Order, nor any act of BB&T in complying with the terms of this Order shall operate to undo, avoid, or negatively affect the perfection of Regions' security interests in the cash maintained in the Debtor's BB&T accounts. Regions and the Debtor affirm the terms of the September 1, 2011 Deposit Account Control Agreement, including the protections therein running in favor of BB&T.

18.   **Effectiveness.**  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

19.   **Final Hearing.**  The Final Hearing is scheduled for _____, 20__ at ____ _.m. before this Court. The Debtor shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or counsel therefore, if appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) Todd Farmer, 329 North 5th Street P.O. Box 7766, Paducah, KY 42002-7766, counsel for the Debtor; (b) Brian H. Meldrum, Stites & Harbison PLLC, 400 W. Market Street, Suite 1800, Louisville, KY 40202, counsel for the Lender; and (c) the Office of the United States Trustee for the Western District of Kentucky, and shall be filed with the Clerk of the United States Bankruptcy Court for the Western District of Kentucky, in each case to allow actual receipt by the foregoing no later than _____, 2011 at 4:00 p.m., prevailing Eastern time.

PREPARED AND PRESENTED BY::

| | |
|---|---|
| /s/ *Brian H. Meldrum* | /s/ *Todd A. Farmer* |
| Brian H. Meldrum | Todd A. Farmer |
| STITES & HARBISON, PLLC | STOUT, FARMER & KING |
| 400 W. Market Street, Suite 1800 | 329 North 5th Street |
| Louisville, Kentucky 40202 | Paducah, Kentucky 42002 |
| Telephone: (502) 681-0578 | Telephone: (270) 443-4431 |
| bmeldrum@stites.com | todd@sfk-law.com |
| | |
| *Counsel for Regions Bank* | *Counsel for Debtor* |

Have Seen:

/s/ *Charles Merrill*
Charles Merrill
Counsel to United States Trustee
601 West Broadway, Suite 512
Louisville, Kentucky  40202


SO ORDERED:


RE206:00RE9:856410:4:LOUISVILLE

13